UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND STATE PIER                    :
PROPERTIES, LLC,                           :
        Plaintiff,                  :
    v.                              :          C.A. No. 12-198S
                                           :
CARGILL, INC.,                             :
        Defendant.                  :

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

In 2004, Plaintiff Rhode Island State Pier Properties, LLC ("RISPP") bought two parcels of industrial land on the Providence waterfront two years after Defendant Cargill, Inc., ("Cargill") terminated its lease of the land, leaving behind unfilled containment craters and a tangle of rusted pipes and oil tanks.  RISPP claims that Cargill should pay RISPP its costs in removing the abandoned personalty and grading to make the land attractive to developers, tasks that were performed without permission from the Rhode Island Department of Environmental Management ("RIDEM") in defiance of an environmental remediation plan for the land imposed on both Cargill and RISPP.  The nub of this dispute is whether Cargill was required by the terms of its lease or by RIDEM to remove the rusted oil tanks and pipes and grade the land at or after the expiration of its lease so that Cargill must indemnify the subsequent owner of the land, RISPP, for its costs in doing so.  Cargill has challenged RISPP's Amended Complaint with a Motion for Summary Judgment (ECF No. 13), contending that Cargill has no legal duty to pay for the work RISPP performed in clearing and grading the land.  RISPP moves for Summary Judgment on Cargill's counterclaims, contending that Cargill was precluded from bringing any claims because it failed to file a proof of claim in RISPP's bankruptcy (ECF No. 15).

These Motions have been referred to me for a report and recommendation; a hearing was held on April 12, 2013.  Because the undisputed facts establish that neither Cargill's lease nor RIDEM's remediation plan required Cargill to perform the work for which RISPP seeks reimbursement and that RISPP's clearing and grading did not confer a benefit on Cargill for which equitable principles mandate payment, I find that RISPP's claims fail as a matter of law and recommend that Cargill's Motion for Summary Judgment be GRANTED.  Further, as RISPP did not list Cargill as a creditor in its bankruptcy, and there is a factual dispute regarding whether Cargill had either notice or actual knowledge of the bankruptcy, I recommend that RISPP's Motion for Summary Judgment be DENIED.

## I. FACTS

While the factual history that undergirds these Motions begins in 1915 and is a tangled tale of owners, tenants, use, contamination and remediation of this industrial real estate at the heart of  Providence's working port, it nevertheless is a tale whose material facts are almost entirely undisputed.[1]  At its vortex are two industrial parcels, Lots 481 and 489, at 170 Allens Avenue.  Together with a third parcel, Lot 128, they have long been used for storage by oil and gas companies, resulting in significant environmental contamination.  Lots 481 and 489 are large contiguous rectangular lots bordering the waterfront.  Lot 128 is a long rectangular sliver completely surrounded by Lot 481.  For the relevant period affecting these claims, RISPP owned Lots 481 and 489, while Cargill has continuously owned Lot 128 and is a former tenant of Lots 481 and 489.  What follows are the undisputed facts to which the controlling legal principles applicable to this dispute must be applied.

---

[1] These facts are drawn largely from Cargill's Statements of Undisputed Facts, which RISPP does not materially contest.  In addition, both parties have presented pleadings, deposition transcripts and affidavits, none of which present any material factual dispute.

The leases governing the relationship of the owners and tenants of Lots 481 and 489 were executed in 1915 (the "1915 Lease") and 1923 (the "1923 Lease") respectively.  Both give the tenant the right to use the premises in any manner, including to make additions and alterations and to excavate without liability for "waste, impairment, destruction, or otherwise," and the right, but not the duty, to remove personal property at the conclusion of the tenancy.[2]  ECF No. 13-3, 13-8.  Specifically, both provide that the tenant's additions, alterations and improvements (in the 1923 Lease specifically including pipe lines and tanks) remain the personal property of

---

[2] In pertinent part, the 1915 Lease states:

> The Lessee shall have the right to make use of or deal with the demised premises in any manner whatsoever including the right to remove, improve, alter or otherwise use or dispose of any and all buildings, sheds, structures of all kinds, tracks, wharves, piers, fences and fixtures and appurtenances of every kind and description now or hereafter located upon or used in connection with said premises, together with the right to grade, fill in, excavate, remove or otherwise use, deal with or dispose of the soil or any rock, stone of other substances or materials therein or thereon, without any liability for waste, impairment, destruction, or otherwise, except that the Lessee shall not commit willful, wanton and malicious acts of waste . . .

> The Lessee shall have the right to make any additions or alterations to and improvements upon the demised premises, and all of such alternations, additions or improvements shall continue and remain the property of the Lessee, who, within ninety days after the termination of said lease, shall have the right to remove the same; provided that the Lessee shall have paid all rents.

ECF No. 13-8.  The 1923 Lease contains similar language, with an insert (underscored below) clarifying that the installation of pipelines and tanks is contemplated:

> FIFTH: The Lessee shall the right to make use of or deal with the demised premises in any manner whatsoever, including the right to tear down, demolish, remove, improve, alter or otherwise use or dispose of any and all buildings, sheds, structures of all kinds, tracks, wharves, piers, fences and fixtures and appurtenances of every kind and description, now or hereafter located upon or used in connection with said premises, and shall have and retain to its own use or otherwise dispose of the materials of which said structures are constructed, together with the right to grade, fill in, excavate, remove or otherwise use, deal with or dispose of the soil of any rock, stone or other substance or material therein or thereon, without any liability for waste, impairment, destruction or otherwise except that the Lessee shall not commit unlawful, wanton or malicious acts of waste . . .

> SIXTH: The Lessee shall have the right to make any additions or alterations to, and improvements upon the demised premises, including the right to lay and maintain such pipe lines and tanks as may be necessary or convenient for the Lessee's business, and all such alterations, additions or improvements shall continue and remain the property of the Lessee, and may be removed by the Lessee at any time during the term hereby demised or may be removed by the Lessee within ninety (90) days after the termination of the Lease, provided, however, that such right of removal shall not exist unless and until the Lessee shall have paid all rent.

ECF No. 13-3 (emphasis supplied).

3

the tenant, who has the right to remove such personal property, if all rent has been paid, for a period of ninety days after the termination of the Lease.  The Leases are silent on what happens if the tenant's personal property is not removed in ninety days but rather is abandoned.

Over the years, Lots 481, 489 and 128 were used for oil storage and coal gasification. Consistent with the 1915 and 1923 Leases, tenants dug containment craters and installed above-ground oil tanks and piping.  In 1986, Cargill became a sublessee[3] of Lots 481 and 489, assuming all rights and responsibilities associated with the 1915 and 1923 Leases; it also acquired ownership of Lot 128.  From 1986 until 2000, Cargill operated a petroleum bulk storage facility at the site.  Environmental problems were first detected in 1992, when punctured oil tanks and contaminated soil and water were discovered.  Cargill worked with RIDEM on a plan that required Cargill to perform ongoing environmental remediation on all three Lots.  As part of its duty to remediate, Cargill installed water monitoring wells on Lots 128, 481 and 489 to track contamination.

The 1915 and 1923 Leases expired pursuant to their express terms on March 31, 2002. Prior to the expiration of both Leases, Cargill gave formal "Notice of Expiration of Sublease," filed in the Providence Records of Land Evidence, in which it stated that "any personal property, fixtures and improvements that remain on said real estate from and after April 1, 2002 will have been abandoned by Cargill, and pursuant to the terms of said [Lease], title thereto will have passed by operation of law to the . . . current owner."  Neither the then-owner of Lot 481 nor the then-owner of Lot 489 objected to this public notice or to Cargill's abandonment of the oil tanks and piping still present at the site.  Neither demanded that Cargill remove the piping and tanks

---

[3] Cargill's precise legal relationship to Lots 481 and 489 is limned by a series of assignments and subleases that are not material to this Motion.  The parties do not dispute that Cargill's legal status is that of tenant under the terms of the 1915 and 1923 Leases.

and or regrade the Lots before or after the expiration of the Leases.[4]  Under RIDEM's direction,

Cargill, as the owner of Lot 128 and former tenant of Lots 481 and 489, continued its

environmental remediation work as required by RIDEM.  RIDEM never instructed Cargill to

remove the tanks and pipes or to regrade any of Lots 481, 489 or 128.[5]

  RISPP purchased Lots 481 and 489 in 2004, two years after Cargill's tenancy ended and

over two years after Cargill gave public notice of its abandonment of the pipelines and tanks.

The purchase was made as part of the creative vision of third-party defendant Patrick T. Conley

("Dr. Conley"), who was then a principal of RISPP, to revamp the industrial waterfront in

Providence and spark an urban renaissance.  Dr. Conley had developed an historic building at

nearby 200 Allens Avenue and was advocating for a shift of the Providence harbor front "from

the dead hand of heavy industry and the hot hand of the porn business" to a multi-use waterfront

zone welcoming to residents, artists, restaurants, hotels, including the possibility of cruise lines

coming into Providence on docks located at Lots 481 and 489.  To actualize this dream, he

would need to make Lots 481 and 489 more attractive to developers, as well as to persuade

Providence to rezone them.

  RISPP purchased Lot 481 for $275,000 and Lot 489 for $300,000.  It is undisputed that

RISPP was able to purchase the Lots at bargain prices because of their environmental

contamination and because "there was an oil tank farm on the site that needed to be removed."

Both sellers were anxious to sell and have the buyer indemnify them.  Dr. Conley and RISPP

were well aware of the environmental contamination and the presence of the rusted piping and

oil tanks on Lots 481 and 489 before RISPP purchased the property, but hoped and expected that

---

[4] This fact was injected in the record by a representation made by Cargill's counsel at oral argument, which RISPP did not dispute.  Accordingly, the Court accepts it as true for purposes of these Motions.

[5] Cargill's environmental work on all three Lots remains ongoing; to date, it has spent $2.2 million on remediation ordered by RIDEM.

RIDEM would force Cargill to clear and grade all three Lots as part of the environmental remediation.  The purchase and sale agreements for Lots 481 and 489 stipulated that RISPP purchased them subject to all environmental conditions and included a general release waiving any claims against the sellers.  The seller of Lot 489, and possibly the seller of Lot 481, assigned any claims it might have against Cargill to RISPP.[6]

After RISPP became the new owner of Lots 481 and 489, RIDEM informed it that it had become a "responsible party" legally required to remediate the environmental contamination, strictly prohibited from disturbing the soil or existing groundwater monitoring wells without prior RIDEM approval and liable for any exacerbation of contamination.  RIDEM ordered RISPP to complete a site investigation, which Dr. Conley refused to do.  Instead, he quickly and publicly became frustrated at what he perceived to be RIDEM's slow pace of environmental remediation, which was threatening his ability to implement his vision for the waterfront.  Dr. Conley explained: "I tend to be a little less observant, frankly, of what I think are unduly onerous, unreasonable regulations and delays, particularly when you're on the hook . . . [and] the clock is ticking."  RISPP also became very frustrated with Cargill.  Soon after RISPP bought the Lots in 2004, Dr. Conley contends that he orally demanded that Cargill remove the tanks and pipes,[7] but Cargill responded that it no longer owned them and refused to acquiesce.  He followed the oral demand with a letter on July 26, 2004, asking Cargill to "provide information regarding your remedial activities."

---

[6] The purchase agreement for Lot 489 reflects the assignment; the copy of the purchase agreement for Lot 481 that is in the record is incomplete, although the portion that does appear is virtually identical to the purchase agreement for Lot 489, suggesting the owner of Lot 481 also assigned any claims it had against Cargill to RISPP.  Therefore, there is a factual dispute regarding whether RISPP steps into the shoes of Cargill's landlord with respect to Lot 481.  This factual dispute is not material to the Court's analysis of these claims.

[7] Cargill does not agree with this fact but does not dispute it for purposes of these Motions.

RISPP quickly lost patience[8] with RIDEM's failure to impose the hoped-for order forcing Cargill to clear Lots 481 and 489; at some point in 2004-2005 (the record does not reveal the dates), without RIDEM's permission or approval,[9] and without notice to or permission from Cargill, RISPP went forward with the construction work at issue in this case, clearing rusted pipe lines and tanks from Lots 481 and 489 and grading not only Lots 481 and 489 but also Lot 128 (which Cargill still owned) to make all three more attractive to potential developers.  Because it was removing the rusted pipes and tanks and regrading the land, a project that it has consistently been clear did not constitute environmental remediation,[10] RISPP took the position that it did not need RIDEM's permission even though it was disturbing the soil.  Rather, RISPP's work was intended to create "a little bit more curb appeal than it had when we bought it," making the Lots more attractive to potential purchasers.

RISPP's work removed the above-ground tanks, piping and other structures, leveled the ground, covered the soil and filled containment craters.  The grading destroyed a fence Cargill had placed around Lot 128 and water monitoring wells that Cargill had installed on Lots 128, 481 and 489 at the direction of RIDEM in connection with the environmental remediation.  All told, RISPP's site work cost $998,703.72, including $681,100 for the services of two

---

[8] RISPP was under time pressure to level and clear the Lots because it had entered into an agreement with the Rhode Island Public Transit Authority to bring the Providence/Newport Ferry to the dock.

[9] Dr. Conley testified at his deposition that if he had asked RIDEM for permission to remove the tanks and piping in 2004, they would still be at the site today.

[10] The only fact presented by Cargill that RISPP disputed pertains to RISPP's insistence that its work was not remediation.  Cargill's Statement Undisputed Fact ¶ 20 states that Dr. Conley "became frustrated with the pace of RIDEM's remedial activities and decided to undertake its own 'remediation,' despite not having received approval or permission from RIDEM."  ECF No. 14 at 4 ¶ 20.  RISPP's Response states that Dr. Conley "was not performing any remediation work.  He was simply working on improving the look of the property."  ECF No. 17-6 at 2 ¶ 20.  This is not a material dispute; indeed, it is not a dispute at all.  Cargill has been clear that it agrees that RISPP performed work that not only was not environmental remediation required by RIDEM, but rather was performed without the approval or permission of RIDEM, was contrary to the remediation plan and resulted in the destruction of monitoring wells mandated by RIDEM.

construction companies, $40,487.12 for soil and gravel, $36,634.57 for oil removal services and most of the remainder for consulting services associated with the project.  When it learned of the work, Cargill complained to RISPP that it was unauthorized, had damaged Cargill's fence around Lot 128 and harmed Cargill's remediation efforts and monitoring wells.[11]

By 2010, six years later, RISPP had still not convinced a developer to purchase Lots 481 and 489 and entered chapter 11 bankruptcy.  In 2012, before it emerged from bankruptcy, RISPP sold Lots 481 and 489 (which had been purchased in 2004 for a total of $575,000) for a combined total of $4 million.

## II. PROCEDURAL HISTORY

In March 2012, RISPP and Dr. Conley filed a single count complaint against Cargill in Rhode Island Superior Court claiming entitlement to equitable indemnification for the $998,703.72 that RISPP spent clearing and grading Lots 481 and 489.  ECF No. 1-1.  Cargill timely removed the case to this Court based on diversity jurisdiction.  It also filed an Answer and Counterclaim against RISPP and Dr. Conley alleging indemnification and contribution, unjust enrichment and breach of contract not only based on RISPP's interference with its remediation, but also seeking to hold RISPP responsible as the owner for some or all of the $2.2 million that that Cargill has paid for remediation.  In September 2012, RISPP moved to amend the Complaint, seeking to remove Dr. Conley as a plaintiff because he never held title to Lots 481 and 489, and to add new counts for unjust enrichment and breach of contract, the latter claim triggered by RISPP's recent discovery of the 1915 Lease.  ECF No. 10.[12]  It is this Amended Complaint that Cargill challenges by its Motion for Summary Judgment.

---

[11] These complaints are incorporated in Cargill's counterclaims.

[12] This Court granted Plaintiff's Motion to Amend in October 2012, but the proposed Amended Complaint was not filed.  Notwithstanding this procedural anomaly, Cargill's Motion for Summary Judgment is addressed to the

Cargill and RISPP have both moved for summary judgment.  Cargill seeks judgment in its favor on RISPP's claims of equitable indemnification (Count I), unjust enrichment (Count II) and breach of contract (Count III).  RISPP seeks summary judgment on all of Cargill's counterclaims, alleging that Cargill never filed a proof of claim in its bankruptcy and therefore is precluded from pressing any claims against it.

## III. ANALYSIS

### A.  Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, discovery, disclosure materials and affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006).  A fact is material only if it possesses the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  The court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party."  Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)).  The non-moving party may not rest merely on conclusory allegations or denials, but must present affirmative evidence of specific facts demonstrating a genuine issue

---

Amended Complaint.  To clear up any confusion, at the hearing on these Motions, the Court directed RISPP to promptly file the Amended Complaint, which it did.  Cargill responded with its Answer to First Amended Complaint, Counterclaim and Third-Party Claim, which included a new counterclaim against RISPP and Dr. Conley for negligence.  The new allegations in Cargill's counterclaim do not affect the merits of these Motions.

as to each element on which it bears the ultimate burden.  See Santiago-Ramos, 217 F.3d at 53

(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

### B.    Cargill's Motion for Summary Judgment

### i.    RISPP's Equitable Indemnification Claim

RISPP must prove three elements to succeed on its equitable indemnification claim: (1)

RISPP is liable to RIDEM for a specific task, (2) Cargill is liable to RIDEM for the same task,

and (3) as between RISPP and Cargill, the obligation ought to be discharged by Cargill.  R & R

Assocs. v. City of Providence Water Supply Bd., 724 A.2d 432, 434 (R.I. 1999).  Equitable

indemnification rests on the principle that one who has been exposed to liability solely as the

result of a wrongful act of another should be able to recover from that party; the purpose of the

action is to require the party primarily liable to hold harmless the party secondarily liable.

Muldowney v. Weatherking Prods., Inc., 509 A.2d 441, 443-44 (R.I. 1986).  When a plaintiff

fails to establish all three elements, the Court may enter summary judgment.  See Boucher v.

McGovern, 639 A.2d 1369, 1377 (R.I. 1994) (plaintiff not entitled to equitable indemnification

under principles of equity as a matter of law); Hotel Assocs., LLC v. HMS Assocs. Ltd. P'ship,

No. Civ.A. 96-6273, 2004 WL 422812, at *17-18 (R.I. Super. Ct. Feb. 20, 2004) (summary

judgment granted when plaintiff failed to submit evidence that defendant was liable to the same

third party as the plaintiff).

RISPP's equitable indemnification claim is based on its hope that RIDEM would require

Cargill to regrade Lots 481 and 489 and remove the rusted tanks and piping.[13]  The claim

---

[13] RISPP unsuccessfully tries to buttress its equitable indemnification claim with speculation based on hearsay that RIDEM might, in the future, require Cargill to clear and grade Lots 481, 489 and 128.  In support, RISPP points to an e-mail to Dr. Conley about a different lot, which refers to the removal of "concrete foundations and other former features" to install a one-foot thick engineering cap as part of the remediation ordered at this other site.  ECF No. 17-3.  Such inadmissible hearsay cannot raise a fact dispute at the summary judgment phase.  Chopmist Hill Fire Dep't v. Town of Scituate, 780 F. Supp. 2d 179, 184 (D.R.I. 2011) (evidence opposing summary judgment must be admissible).  In any event, it requires the rankest speculation to draw the conclusion from this e-mail regarding the

founders because RIDEM never imposed that requirement on either Cargill or RISPP; put differently, neither RISPP nor Cargill were ever liable to RIDEM for the work for which RISPP seeks indemnification.  See R & R Assocs., 724 A.2d at 434 (successful equitable indemnification claim requires that plaintiff and defendant are both liable to the same third party for the claim).  RISPP's admission that the work it performed on Lots 128, 481 and 489 was not environmental remediation mandated by RIDEM, but rather was undertaken to improve the look of the property, coupled with Cargill's undisputed evidence that RIDEM never told it to perform the work that RISPP unilaterally undertook at the site, is fatal to the claim of equitable indemnification.  See Hotel Assocs., LLC, 2004 WL 422812, at *17-18 (defendant entitled to summary judgment on equitable indemnification claim when RIDEM never asked to defendant to perform work for which plaintiff seeks contribution).

Cargill is entitled to summary judgment on RISPP's equitable indemnification claim.

**ii.     RISPP's Unjust Enrichment Claim**

RISPP's claim for unjust enrichment requires proof that: (1) RISPP conferred a benefit on Cargill, (2) Cargill appreciated the benefit, and (3) Cargill accepted the benefit in such circumstances that it would be inequitable for it to retain the benefit without paying for it.  W. Reserve Life Assurance Co. of Ohio v. Caramadre, 847 F. Supp. 2d 329, 348 (D.R.I. 2012).  A benefit is "conferred" when improvements are made to property, materials are furnished, or services are rendered without payment; a benefit is "appreciated" when the defendant uses it in a way that has value to the defendant.  Narragansett Elec. Co. v. Carbone, 898 A.2d 87, 99-100 (R.I. 2006).  The most significant requirement – that the enrichment to the defendant be unjust –

---

remediation imposed at a different lot that, at some time in the future, RIDEM would have required Cargill to regrade Lots 128, 481 and 489 or to remove tanks and piping.  See Jakobiec v. Merrill Lynch Life Ins. Co., 711 F.3d 217, 225 (1st Cir. 2013) (conclusory allegations and unsupported speculation are insufficient to defeat summary judgment).

is predicated on the equitable principle that one should not be permitted to enrich oneself at the expense of another by receiving property or benefits without paying for them.  Id.  When the undisputed facts show that a defendant did not unjustly appreciate a benefit, the Court may enter summary judgment.  See, e.g., Ciampi v. Zuczek, 598 F. Supp. 2d 257, 263 (D.R.I. 2009) (nominal benefit to town was not unjust as a matter of law); Hord Corp. v. Polymer Research Corp. of Am., 275 F. Supp. 2d 229, 239 (D.R.I. 2003) (summary judgment appropriate when defendant neither appreciated nor inequitably retained any benefit from work done on its property).

RISPP contends that Cargill was unjustly benefited when RISPP removed the tanks and piping on Lots 481 and 489 and regraded Lots 128, 481 and 489 because its own property, Lot 128, is more valuable today because of RISPP's site work.  To buttress the claim, RISPP submits an affidavit from Dr. Conley, in which he attests that RISPP bought Lots 481 and 489 at an effective price of $2.92 per square foot ($575,000) and sold them for $20.35 per square foot ($4 million).  Applying the same square foot price increase to Lot 128, and assuming that Lot 128's value rose at the same rate since it is located entirely within Lot 481, Dr. Conley concludes that Lot 128 increased in value from $68,649 in 2004 (when RISPP purchased its Lots) to $478,429 in 2012 (when RISPP sold its Lots), all courtesy of RISPP's clearing and grading.[14]  His claim seeks to recover the delta ($409,780) as a benefit unjustly accepted by Cargill.

RISPP's theory fails because it assumes that a property owner may be liable for unjust enrichment whenever a neighbor, acting for his own benefit, improves his own property and, without permission, that of his neighbor.  If this was the law, keeping up with the Joneses pays for itself because the neighbors whose property values might benefit from the improvement can

---

[14] For purposes of this Motion, Cargill does not dispute RISPP's factual evidence that Lot 128's fair market value was improved by the work done by RISPP.

be charged for the work.  Not surprisingly, courts have soundly rejected this theory of unjust enrichment.  See, e.g., In re Cole & Sons Trucking Servs., Inc., 109 B.R. 538, 541 (Bankr. D. Mass. 1990) ("a homeowner who improves his own property and thereby enhances the value of his neighbor's property cannot recover that enhancement from the neighbor") (citing Restatement (First) of Restitution, § 1 comment c (1937)); HAD Enters.. v. Galloway, 948 N.E.2d 473, 480 (Ohio Ct. App. 2011) (no unjust enrichment when neighbor performs work on neighbor's land for his own benefit).

RISPP's unjust enrichment claim also fails as a matter of law because the equities do not favor RISPP.  See PHL Variable Ins. Co. v. P. Bowie 2008 Irrevocable Trust ex rel. Baldi, 12-2243, 2013 WL 1943820, at *7-9 (1st Cir. May 13, 2013) (trial court may balance equities at summary judgment based on undisputed facts).  If the Court accepts that the grading and the removal of the tanks and piping conferred a benefit on Cargill by enhancing the fair market value of Lot 128, the undisputed facts nevertheless establish that RISPP performed the work in a self-interested attempt to attract a developer to buy its own lots – a goal that RISPP realized when Lots 481 and 489 were sold at a price that included a multi-million dollar profit.  RISPP recovered the cost of site work ($998,703.72) and more when it sold the Lots for $3.425 million more than the price it had paid in 2004.  See, e.g., CMC Heartland Partners v. Gen. Motors Corp., No. 92 C 4449, 1994 WL 498357, at *20 (N.D. Ill. Aug. 30, 1994) (no claim for unjust enrichment when company performed remediation to protect its own interests); McNeilab, Inc. v. N. River Ins. Co., 645 F. Supp. 525, 549 (D.N.J. 1986) (courts consistently deny attempts of persons acting to serve their own self-interest because they would have done the same thing even if the beneficiary possessed no interest in the object of the actor's efforts).

RISPP argues that the failure of Cargill or RIDEM to stop its clearing and grading of Lots 481, 489 and 128 creates a factual dispute regarding whether Cargill appreciated an unjust benefit.  The argument ignores that it is undisputed that Cargill did not give RISPP permission to proceed, did not know about RISPP's intent to perform the work and explicitly rejected RISPP's actions when it became aware of them.  Where the undisputed facts also establish that RISPP did the work unilaterally for its own benefit and that Cargill did not request RISPP to perform the work, summary judgment on RISPP's claim for unjust enrichment is appropriate.  See Hurdis Realty, Inc. v. Town of N. Providence, 397 A.2d 896, 897-98 (1979) (unjust enrichment claim successful because defendant fully aware of repair work performed by plaintiff); Restatement (Third) of Restitution & Unjust Enrichment § 2 (2011) (no liability for an unrequested benefit voluntarily conferred; innocent recipient is not liable for a forced exchange).

Under the circumstances posed by the undisputed facts presented by the parties, it is not inequitable for Cargill to retain any benefit that it may have received as a result of RISPP's unilateral action.  See Narragansett Elec. Co., 898 A.2d at 100.  Cargill is entitled to summary judgment on RISPP's claim for unjust enrichment.

### iii.    RISPP's Breach of Contract Claim

To succeed on its breach of contract claim based on the terms of the 1915 and 1923 Leases,[15] interpreted under Rhode Island law,[16] RISPP must prove: (1) an agreement between it

---

[15] While a lease is the conveyance of a property interest, the applicability of the law of contracts to interpret the rights and duties created by a lease is well settled. 1 Tiffany Real Prop. § 74 (2012 ed.) (construction of leases is subject to general rules of construction of contracts, and the intention of the parties is controlling); see J.R.P. Assocs. v. Bess Eaton Donut Flour Co., No. PC 94-0210, 1998 WL 356896, at *1 (R.I. Super. Ct. June 22, 1998) ("A commercial lease negotiated by landlord and tenant is a contract, and its validity and construction are governed by substantive rules of contract law.").

[16] This is a diversity case pursuant to 28 U.S.C. § 1332, in which the Court must apply the choice of law rules of the forum state, i.e. Rhode Island.  Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  The parties agree that the Leases at issue, which were negotiated, executed, and intended to be performed in Rhode Island, are governed by Rhode Island law.  ADP Marshall, Inc. v. Noresco, LLC, 710 F. Supp. 2d 197, 211-12 (D.R.I. 2010)

and Cargill, (2) Cargill's breach of the agreement, and (3) the breach caused (4) damages to

RISPP.  Barkan v. Dunkin' Donuts, Inc., 627 F.3d 34, 39 (1st Cir. 2010).  "Contract

interpretation is a question of law."  ADP Marshall, Inc., 710 F. Supp. 2d at 212.  The Court's

objective when construing the contractual terms of a lease is to ascertain the parties' intent at the

time the lease was formed.  Id.; H.P. Hood & Sons, Inc. v Reali, 308 F. Supp. 788, 791 (D.R.I.

1970); Reynolds v. Wash. Real Estate Co., 49 A. 707, 709 (R.I. 1901).  When the contract

language is clear and unambiguous, the parties' intent is based solely on the plain meaning of the

written words.  Feinstein v. Brown, 432 F. Supp. 2d 258, 269 (D.R.I. 2006).  Nonexistent terms

should not be read into a contract.  Takian v. Rafaelian, 53 A.3d 964, 979 (R.I. 2012).  Courts

also should not impose missing contractual obligations by implication unless the evidence

establishes that that missing language is indispensable to effectuate the parties' intent, was

omitted by sheer inadvertence or is so obvious as to need no expression.  Nicholson v.

Tourtellotte, 293 A.2d 909, 912 (R.I. 1972).  When the contract is clear and the facts undisputed,

summary judgment is appropriate.  Dan Cake (Port.) S.A. v. CVS Pharm., Inc., 862 F. Supp. 2d

120, 125-27 (D.R.I. 2012) (summary judgment on breach of contract when facts undisputed);

Hord Corp., 275 F. Supp. 2d at 235 (when a contract is clear and unambiguous, task of judicial

construction ends; court will enforce contract as written at summary judgment).

　　　　RISPP's breach of contract theory goes like this: Cargill, as tenant of Lots 481 and 489

under the 1915 and 1923 Leases, assumed all responsibilities set forth in the Leases, while

RISPP stepped into the shoes of Cargill's former landlords when it purchased Lots 481 and 489;

therefore, RISPP is entitled to sue for Cargill's breach of its contractual duty under the Leases to

grade and remove the tanks and piping from Lots 481 and 489 after Cargill vacated the property

without discharge of these duties.  If this Court assumes that RISPP can sue for breach of

contract based on the 1915 and 1923 Leases despite the lack of direct privity with Cargill,[17] RISPP's breach of contract claim fails because the Leases do not impose a duty on the tenant to remove personalty and restore the land at their expiration and applicable law does not permit the imposition of such a duty as an implied contractual obligation.

The 1915 and 1923 Leases expressly permitted Cargill, and its predecessor tenants, to "make use of the demised premises in any manner whatsoever," including both to add additions, alternations and improvements and to excavate; the 1923 Lease specifies that additions, alterations and improvements include the addition of "such pipe lines and tanks as may be necessary or convenient for the Lessee's business."  Both Leases expressly state that the right to use the premises in any manner, the right to make improvements, and the right to excavate may be exercised "without any liability for waste, impairment, destruction, or otherwise."[18]  The initial tenants were the Huasteca Petroleum Company (1915 Lease) and the Mexican Petroleum Corporation (1923 Lease) – the undisputed facts establish that, over the eighty-seven years of their total duration, these Leases continuously contemplated use of the Lots for a petroleum storage facility.

Significantly, the Leases give the tenant the right to remove personalty, such as the pipe lines and tanks, under specified circumstances after their expiration; however, they impose no obligation to do so.  Further, they provide that the tenant has the "right to grade, fill in, excavate,

---

[17] RISPP's argument in favor of this assumption is well founded at the Summary Judgment stage: Cargill admits it subleased Lots 481 and 489 through a series of assignments from the original signatories and that it assumed the contractual responsibilities of the tenants set forth in the 1915 and 1923 Leases.  SOF ¶¶ 3-8.  The record also shows that the prior owner/landlord of Lot 489 (and possibly the prior owner/landlord of Lot 481, see fn. 6, supra) assigned any claims it may have had against Cargill, as its tenant, to RISPP when it purchased the Lot in 2004.  ECF No. 13-13, 13-27.  To the extent the prior owners had a breach of contract claim against Cargill arising from the Leases, the assignment passes those claims to RISPP.  See generally Piccoli & Sons, Inc. v. E & C Constr. Co., Inc., 64 A.3d 308 (R.I. 2013).

[18] The Leases make the tenant responsible only for "unlawful, wanton or malicious acts of waste."  There is no suggestion of that here.

remove or otherwise use, deal with or dispose of the soil or any rock, stone or other substances or material therein," yet they impose no duty to restore the land affected by these activities, but rather make clear that the tenant cannot be liable for "waste, impairment, destruction, or otherwise."  When, as here, the contract plainly addresses the topics of adding alterations like pipe lines and tanks, and excavating craters, but omits any duty within the scope of those topics, instead expressly exonerating the tenant for liability arising from such activities, the venerable maxim of contract interpretation, *expressio unius est exclusio alterius*, is a helpful interpretive guide.  See Gorman v. Gorman, 883 A.2d 732, 738 & n.9 (R.I. 2005) (whatever is omitted is understood to be excluded).  Accordingly, the proper interpretation of these unambiguous Leases is that the exclusion of a duty to clear and grade at their expiration was intentional and the imposition of such a duty was not contemplated by the parties.

Despite the clarity of the Leases, RISPP argues that Section 12.2 of the Restatement (Second) of Property, Landlord & Tenant (1977) ("Restatement), requires the imposition of an implied duty under the circumstances presented here.  Section 12.2 provides:

> Except to the extent that the parties to a lease validly agree otherwise, there is a breach of the tenant's obligation if he makes permissible changes in the leased property and does not, when requested by the landlord, restore, where restoration is possible, the leased property to its former condition within [a reasonable time after the lease terminates][19] or within a reasonable time after the request to restore, whichever is later . . . unless it would be unreasonable to require the restoration in light of the probable future use of the property.

In support of its argument, RISPP relies on three cases interpreting the law of other jurisdictions. Two of them impose an implied duty on the tenant to clean up conditions that are beyond the reasonable wear and tear caused by the use contemplated by the lease.  U.S. Gypsum Co. v. Schiavo Bros., Inc., 668 F.2d 172, 176-78 (3d Cir. 1981) (applying Pennsylvania law,

---

[19] This bracketed language is cross-referenced in § 12:2 and appears in the Restatement (Second) of Property, Landlord & Tenant § 12.3 (1977).

abandonment by tenant, whose subtenant operated junkyard, of massive amounts of debris is beyond the scope of reasonable wear and tear contemplated by the parties); Abramo v. Ploener, 394 A.2d 758, 761-62 (Del. Super. Ct. 1978) (applying Delaware law, parties did not contemplate that tenant should be allowed to leave behind old tires and junk). The third case is not applicable because it establishes an implied duty in the unique relationship of the operator of an oil well to the surface owner. Bonds v. Sanchez-O'Brien Oil & Gas Co., 715 S.W.2d 444, 444-46 (Ark. 1986) (announcing new principle of Arkansas oil and gas law consistent with trends in oil industry, imposing duty on oil well operators to restore surface on termination of oil production).

U.S. Gypsum and Abramo do not advance RISPP's cause.

In U.S. Gypsum, the court expressly looked to the nature of the use contemplated by the parties and found that it did not include the detritus of judgment-proof junkdealers, based on the implied promise of the tenant not to waste the property. Id. at 175-76, 178. By contrast with the lease interpreted in U.S. Gypsum, the 1915 and 1923 Leases contemplated the addition of pipe lines and tanks, as well as the excavation of craters, and specified that these activities would not expose the tenant to liability for "waste, impairment, destruction or otherwise." Both Leases expressly addressed the rights of the tenant at the expiration of the lease and are silent in imposing any affirmative duty.

Similarly, the Abramo court's focus was that "the tenancy was not for the purpose of conducting a dump, where the permanent addition of material was contemplated." 394 A.2d at 761. By contrast with the Abramo lease, the 1915 and 1923 Leases were for the purpose of oil storage and the Leases, by their failure to create a duty to clear and grade, are fairly construed as contemplating that no such duty was intended. Reynolds, 49 A. at 709 (intention of landlord and

tenant inferred from the terms of the contract, as consistent with settled rules of law); see also Nicholson, 293 A.2d at 912 (party must present evidence that signatories agreed to an implied contractual duty).

Section 12.2 of the Restatement calls for the imposition of an implied duty to restore the premises only if the parties to a lease did not validly agree otherwise.  Here the parties to the 1915 and 1923 Leases clearly agreed that the tenants would have no liability arising from either the addition of pipe lines and tanks or from the excavation of craters.  Accordingly, Cargill is entitled to summary judgment on RISPP's breach of contract claim.

### C.     RISPP's Motion for Summary Judgment on Cargill's Counterclaims[20]

RISPP asks this Court to find that Cargill's counterclaims are barred as a matter of law based on its bankruptcy.  It contends that the counterclaims arose prior to 2010 when it filed its petition under chapter 11 and that its discharge terminated the claims because of Cargill's failure to file a proof of claim or otherwise participate in its bankruptcy.

With limited exceptions, a chapter 11 bankruptcy proceeding "discharges the debtor from any debt that arose before the date of such confirmation."  11 U.S.C. § 1141(d)(1)(A).  Under the Bankruptcy Code, the term "debt" includes "liability on a claim," broadly interpreted as a right to payment based on contractual and equitable remedies.  See Reyes v. Standard Parking Corp., 461 B.R. 153, 157 (D.R.I. 2011).  However, the failure of the debtor to list a claim as a debt in its schedules generally means the claim is not discharged, unless the creditor had "notice or actual knowledge" of the bankruptcy such that the creditor should have participated in a timely fashion. 11 U.S.C. § 523(a)(3)(A); see Colonial Sur. Co. v. Weizman, 564 F.3d 526, 530 (1st Cir. 2009); In re Taylor, No. 12-1908, 2013 WL 647501, at *2 (E.D. La. Feb. 21, 2013).  If the creditor files suit on the claim after discharge, it must show that the debtor did not list the claim as a debt in its

---

[20] This Motion does not affect the counterclaims against Dr. Conley.

bankruptcy schedules.  The burden then shifts to the debtor to present evidence that the creditor nevertheless had notice or actual knowledge of the bankruptcy proceeding.  In re Gray, 57 B.R. 927, 931-32 (Bankr. D.R.I. 1986).  If the creditor did not receive timely notice or have actual knowledge of the bankruptcy, the claim remains viable despite the bankruptcy.  See Reyes, 461 B.R. at 160.

RISPP's Motion is grounded in Cargill's failure to file a proof of the claims now reflected in its counterclaims, thereby precluding it from bringing these claims against RISPP based on the bankruptcy discharge.  However, Cargill has demonstrated that RISPP did not schedule Cargill as a creditor (secured or unsecured), and there is no evidence that Cargill had actual notice of the bankruptcy.  In re R.I. State Pier Props., LLC, No. 10:bk:13937, ECF No. 111, 117 (Bankr. D.R.I. July 28, 2011).  The only reference to Cargill in RISPP's bankruptcy schedules is to an asset, not a potential debt: Schedule B ("Property") lists a "[c]laim against Cargill Energy for reimbursement for cleaning site of Cargill debris" as an asset worth $1,020,000.[21]  Id., No. 10:bk:13937, ECF No. 15.

Since RISPP did not list Cargill as a creditor on its schedules, it bears the burden of presenting sufficient factual evidence to establish entitlement to discharge of an unscheduled debt.  This requires a factual analysis of the evidence that Cargill had notice or actual knowledge of the bankruptcy sufficient to establish that Cargill should be barred.  In re Gray, 57 B.R. at 931-32.  In the record on these Motions for Summary Judgment, the only evidence from which knowledge could be inferred is a February 24, 2012, newspaper article referring to the "sale of a large section of [ ] Conley's Pier property on Allens Avenue" in connection with the chapter 11

---

[21] This reference is insufficient to prove notice because there is no duty to notify a party against whom the debtor has a claim.  See Fed. R. Bankr. P. 2002; In re USinternetworking, Inc., 310 B.R. 274, 282 (Bankr. D. Md. 2004) (debtor's duty to disclose assets is for the benefit of the creditors and the court).

bankruptcy, which is attached to Dr. Conley's affidavit – and there is no evidence that anyone from Cargill saw it.

Under these circumstances, RISPP's affirmative defense based on its bankruptcy discharge will require a factual determination, potentially including issues of credibility, regarding what Cargill knew and when it knew it.  Accordingly, summary judgment must be denied.  In re Slaiby, 50 B.R. 245, 249-50 (Bankr. D.N.H. 1985) (fact issues regarding notice of bankruptcy precludes summary judgment); see 11 U.S.C. § 523(a)(3)(A).

## IV. CONCLUSION

For the foregoing reasons, I recommend that Defendant Cargill's Motion for Summary Judgment (ECF No. 13) be GRANTED as to all counts of RISPP's Amended Complaint, and that RISPP's Motion for Summary Judgment (ECF No. 15) be DENIED.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its service.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
May 31, 2013